Filed 9/17/25  P. v. Silva CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>VICTOR PIERRE BENTO SILVA,<br><br>　　　Defendant and Appellant. | A169643<br><br><br>(Sonoma County<br>Super. Ct. No. SCR6845971) |

     In 2017, Victor Pierre Bento Silva was sentenced to 41 years to life after he pleaded no contest to first degree murder (Pen. Code, § 187, subd. (a))[1] and robbery (§ 211), and admitted to personal use of a firearm (§ 12022.53, subd. (b)).  In 2021, Silva filed a petition for resentencing under section 1172.6.  The trial court denied the petition after an evidentiary hearing.  Silva argues the court's finding that he acted with reckless indifference to human life is not supported by substantial evidence.  We affirm.

## BACKGROUND

     We summarized the facts as follows in our prior nonpublished opinion (*People v. Silva* (Aug. 16, 2018, A153589)).

---

[1] Further undesignated statutory references are to the Penal Code.

1

"The prosecution charged Silva with murder (§ 187, subd. (a); count 1), kidnapping (§ 209, subd. (b)(1); count 2), first degree residential burglary (§ 459; count 3), first degree residential robbery (§ 211; count 4), driving or taking a vehicle without consent (Veh. Code, § 10851, subd. (a); count 5), and elder abuse (§ 368, subd. (b)(1); count 6). As to the murder charge, it was alleged there were special circumstances, in that the murder was committed during a kidnapping, a burglary and a robbery (§ 190.2, subd. (a)(17)). In counts 1, 2, and 4, it was alleged Silva personally used a firearm (§§ 12022.53, subd. (b), 1203.06, subd. (a)(1), 12022.5, subd. (a)), or the principal was armed with a firearm (§ 12022, subd. (a)(1)). In counts 3, 5, and 6, it was alleged Silva personally used a firearm (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)), or the principal was armed with a firearm (§ 12022, subd. (a)(1)).

"The prosecution alleged Silva and Stephanie Hill confronted an 84-year-old woman in Penngrove, California, at gunpoint, forced her into her home, bound her to a chair, and shot her in the head. Silva and Hill stole items from the victim's home, including a car. Two days later, they were located by law enforcement in Riverside County. After a high-speed chase into the State of Arizona, Hill was killed in a shoot-out with law enforcement.

"On September 29, 2017, Silva pled no contest to murder (§ 187, subd. (a)), and robbery (§ 211), and he admitted to personal use of a firearm in the commission of the robbery (§ 12022.53, subd. (b)). On December 7, 2017, pursuant to the terms of the plea agreement, the court sentenced Silva to 41 years to life in prison, comprised of a determinate term of 6 years for robbery and 10 years for the firearm use enhancement, and an indeterminate term of 25 years to life for first degree murder."

In 2021, Silva filed a petition for resentencing under section 1172.6.[2] The trial court issued an order to show cause and held an evidentiary hearing in 2023. At the evidentiary hearing, the prosecution presented testimony from Detective Gary Freitas.[3] Freitas was the lead detective in the case, and he traveled to Arizona to interview Silva while he was in custody. Freitas explained that the interview was recorded, and a transcript of the interview was admitted into evidence.

The following facts from the robbery are based on Silva's interview with Detective Freitas. Silva told Freitas that he had only known Hill two to three months, and they had been married for one month, at the time of the crimes. Silva explained that two days before the robbery, he was riding with Hill in her car when they were pulled over by the Novato Police Department. Hill evaded the police because there was a gun in the car. They pulled over along the freeway, abandoned the car, and slept in some bushes nearby. The following morning they went back to the car and Hill drove them to the victim's property. Hill knew the victim, and the victim allowed them to stay

---

[2] The statute was renumbered in 2022 from section 1170.95 to section 1172.6 without any substantive changes. (Stats. 2022, ch. 58, § 10.)

[3] The prosecution also introduced multiple exhibits into evidence, and the trial court took judicial notice of the presentence report and the preliminary hearing transcript. On appeal, the People argue Silva failed to provide an adequate record on appeal because the record only included his police interview and the testimony of Detective Freitas from the evidentiary hearing. Silva attempted to augment the record to include the clerk's transcript from his previous appeal and various volumes of the preliminary hearing transcript, but the deputy clerk was initially unable to find the documents and later rejected the second filing for nonconformance. However, Silva was eventually able to submit the documents to the court, and they are before us today. And even without the augmented record, the record was sufficient to resolve the matter before us. Therefore, we reject the People's argument that the record is inadequate.

in a barn on her property.  Silva and Hill lay low in the barn the entire day and slept there.

The next morning, Hill told Silva that her ex-boyfriend "made a living stealing people's identity, stealing their money, stealing their cars," and that "everything that he's stolen" was "in one of those barns" on the property.  Hill wanted to go inside the victim's house, get the keys to the barns, and take the stolen goods.  Silva then asked, " 'Okay, what would you like me to do?' "  Hill responded, " 'You can either come with me or you can watch me [*sic*] back.' " Silva, as her newlywed husband, decided to take part in the robbery.

Silva and Hill put on masks and gloves.  They were both holding guns when they approached the victim in her garage.  Silva ordered the victim to the ground and inside the home.  Silva demanded to know the location of the keys to the barns, but the victim was uncooperative.  Silva and Hill then tied the victim down to a chair, placed a pillowcase over her head, and began searching for the keys to the barns and other valuables.

Approximately 20–30 minutes after the robbery began, after Silva and Hill were inside the home and tied up the victim, an older gentleman pulled into the driveway in a truck and parked next to the garage.  He did not enter the home, and after approximately 15–20 minutes, he left.  Silva asked the victim whether he was going to come back, and she responded that he should not be back.

After the truck left, Silva and Hill continued to ransack the victim's home, stealing approximately $10,000; jewelry; old, collectible coins; and other valuables.  After they gathered what they could and were getting ready to go, Hill asked Silva, " 'What are we going to do with the lady?' " Silva replied, " 'We're not gonna do anything with the lady.' [*sic*]  You know she didn't do a damn thing to us why, we took everything that belongs to her

4

already.' " Hill pressed on, " 'So we're gonna leave a witness?' " Silva again replied, " 'She didn't do anything to us.' 'We don't need to hurt her or anything.' " Hill again asked, " 'We gonna leave a witness?' " Silva responded, " 'Look I'm gonna go to the car whatever it is that you wanna do with her you do it.' 'Don't tell me I don't want to know.' " Silva placed all of the bags on the front steps so he would not have to go back into the home and "have to see anything if it did happen."

Silva felt like they had been at the home for "too long," saying that he had never done this before and that he did not want to get in trouble for something when he had "no . . . idea what's going on." Silva stated he was only there to have Hill's back and to show her that he loved her. Silva loaded all of the bags into the victim's car and asked Hill if she was ready to go. Hill said, " 'I have to do something with the lady,' " and Silva responded, " 'Do what you gotta do.' " Hill went back into the house after which Silva heard a single gunshot. Hill came out of the house seconds after the gunshot, holding the gun in her hand. Hill got into her own car and Silva was in the victim's car when they drove away. Shortly after, they discarded Hill's car, and they both drove away in the victim's car.

A few months after the evidentiary hearing, the trial court filed a written order finding Silva was a major participant in the robbery and acted with reckless indifference to human life, and denied the petition for resentencing.

## DISCUSSION

We find that Silva was a major participant in the robbery and acted with reckless indifference to human life.[4]

"Senate Bill [No.] 1437 [(2017–2018 Reg. Sess.)] significantly limited the scope of the felony-murder rule to effectuate the Legislature's declared intent 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citations.] Penal Code section 189, as amended, now limits liability under a felony-murder theory principally to 'actual killer[s]' (Pen. Code, § 189, subd. (e)(1)) and those who, 'with the intent to kill,' aid or abet 'the actual killer in the commission of murder in the first degree' (*id.*, subd. (e)(2)). Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [Penal Code] Section 190.2'— that is, the statute defining the felony-murder special circumstance. (*Id.*, § 189, subd. (e)(3).)" (*People v. Strong* (2022) 13 Cal.5th 698, 707–708, 1st & 2d bracketed insertions added (*Strong*).)

"Senate Bill 1437 also created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended. [Citations.] Under newly enacted section 1172.6, the process begins with the filing of a petition containing a declaration that all requirements for eligibility are met (*id.*, subd. (b)(1)(A)), including that

---

[4] Accordingly, we decline to address whether substantial evidence supported a finding that Silva committed second degree murder as a direct aider and abettor.

6

'[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to [Penal Code] Section 188 or 189 made effective January 1, 2019,' the effective date of Senate Bill 1437 (§ 1172.6, subd. (a)(3)). [¶] When the trial court receives a petition containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' [Citations.]" (*Strong, supra*, 13 Cal.5th at p. 708, fn. omitted.)

"If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the [trial] court shall issue an order to show cause." (§ 1172.6, subd. (c).) The court may then hold an evidentiary hearing to determine whether to vacate the murder conviction where the burden of proof is on the prosecution to prove, beyond a reasonable doubt, that the petitioner could be presently convicted of murder. (*Id.*, subd. (d)(1) & (d)(3).)

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), our Supreme Court identified a series of considerations in analyzing whether a defendant was a major participant as defined in section 190.2: " 'What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?' " (*Strong, supra*, 13 Cal.5th at pp. 704–706, citing *Banks, supra*, 61 Cal.4th at p. 803.) None of these considerations is dispositive, and they " '[a]ll may be weighed in determining

7

the ultimate question, whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major" [citations].' " (*Strong*, at p. 706.)

While *Banks* primarily focused on the major participant element, the decision also discussed the reckless indifference element, holding "that knowing participation in an armed robbery, standing alone, is insufficient to establish a defendant's reckless indifference to human life." (*Strong, supra*, 13 Cal.5th at p. 706, citing *Banks, supra*, 61 Cal.4th at pp. 807–811.) A year later, in *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), our Supreme Court "concluded that ' "reckless indifference," . . . encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.' " (*Strong, supra*, 13 Cal.5th at p. 706, quoting *Clark, supra*, 61 Cal.4th at p. 617.)

The *Clark* court provided an additional list of considerations for the reckless indifference analysis, "including use of or awareness of the presence of a weapon or weapons, physical presence at the scene and opportunity to restrain confederates or aid victims, the duration of the crime, knowledge of any threat the confederates might represent, and efforts taken to minimize risks." (*Strong, supra,* 13 Cal.5th at p. 706, citing *Clark, supra*, 61 Cal.4th at pp. 618–623.) "Because the major participant and reckless indifference elements often ' "significantly overlap" ' [citations], this list of factors also overlapped with those we had identified in connection with the major participant inquiry in *Banks*." (*Strong*, at p. 706, quoting *Clark, supra*, 61 Cal.4th at p. 615.)

In determining whether a trial court correctly denied a section 1172.6 petition after an evidentiary hearing, we review the factual findings for

8

substantial evidence and the application of those facts to the statute de novo. (*People v. Cooper* (2022) 77 Cal.App.5th 393, 412.) "The scope of our review for substantial evidence is well settled. The test is not whether the People met their burden of proving beyond a reasonable doubt that [Silva] was ineligible for resentencing, but rather 'whether *any* rational trier of fact could have' made the same determination, namely that '[t]he record . . . disclose[s] . . . evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find [as did the superior court]. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the [order] the existence of every fact the [superior court] could reasonably have deduced from the evidence. [Citation.] "Conflicts [in the evidence] . . . subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge . . . to determine the . . . truth or falsity of the facts upon which a determination depends. [Citation.]" ' " (*People v. Williams* (2020) 57 Cal.App.5th 652, 663.)

The trial court made various factual findings applying the *Banks* and *Clark* factors and determined Silva was a major participant and acted with reckless indifference. First, the court found Silva "was a 'major participant' in the underlying armed robbery. [Silva] was an active co-participant in the robbery, involved in obtaining supplies such as guns and masks, and involved in the apprehension of the victim, securing and blindfolding her, and removing her property from the residence in a coordinated effort with his wife, Ms. Hill. [Silva] was armed or had access to a firearm throughout the robbery itself and in the flight from law enforcement that followed, as did his wife, Ms. Hill. The court finds specifically that [Silva] must have been aware of Ms. Hill's threatening and violent nature, as the record of conviction

9

demonstrates she consistently portrayed herself in such a way, and frequently made overt statements about committing violent acts. As her partner in crime, and her husband, the court finds [Silva] must have known she was dangerous. [Silva] was aware of the dangerousness of an armed robbery, utilizing a firearm during the robbery and engaging in conversation with Ms. Hill directly about whether the victim was to be left alive or killed. While [Silva] was not present in the room the moment the shot was fired into [the victim's] face, he was very much in a position to dissuade Ms. Hill from killing [the victim], physically intervene to stop her, or at the very least render aid after the shooting occurred. Unfortunately for [the victim], [Silva] instead gave tacit approval for Ms. Hill to eliminate any live witness to the robbery when he told her to 'Do what you need to do.' "

Likewise, the trial court held that Silva "acted with 'reckless indifference to human life.' [Silva] knew that firearms would be used during the felony, as demonstrated by the fact that both he and Ms. Hill were armed throughout the event, and both of them actively used their guns to capture and control the victim . . . . [Silva] must have known that Ms. Hill would use the gun to shoot [the victim] after discussing with Ms. Hill whether they would leave behind a live witness or not. [Silva] was physically present in the company of the shooter, Ms. Hill, when she indicated she would not leave behind a living witness to their crimes, and he essentially endorsed the killing so long as he was not the shooter. He did nothing to protest against, physically prevent or in any way dissuade or stop the killing, despite being at the scene and the only person conceivably able to stop the murder of [the victim]. Instead, knowing how violent Ms. Hill was, and aware of the fact that she was armed with a pistol, had just committed a robbery, and had a victim/witness tied to a chair with a pillowcase over her head, [Silva] said

10

for Ms. Hill to do what she needed to do, a chilling example of indifference to human life."

Here, Silva concedes he was a major participant in the robbery that led to the victim's death under the first two *Banks* factors—for his role in planning the robbery and his personal use of a lethal weapon in carrying out the robbery. Yet, Silva disputes the trial court's finding that he acted with reckless indifference because the record does not show he knew, before the robbery, Hill would use her gun to shoot the victim. Silva argues the third *Banks* factor—defendant's awareness of the particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants—focuses on Silva's awareness of Hill's violent nature *before* the robbery. Specifically, Silva notes that the prosecution's evidence that Hill was dangerous and violent came from witnesses who encountered her after the robbery and whose opinions were based on information about Hill obtained after the robbery. In other words, Silva argues he was not aware of Hill's violent nature before the robbery and therefore the court's finding that he knew Hill would shoot the victim is not supported by substantial evidence.

Similarly, Silva argues the fourth *Banks* factor—whether he was present at the scene of the killing, in a position to facilitate or prevent the actual murder, and whether his own actions or inaction played a particular role in the death—does not support the trial court's finding of reckless indifference to human life. Silva first notes that he was not present in the home when Hill killed the victim. Silva also claims the court erred in finding that he did nothing to stop the murder because the court "placed no limitation on what [Silva] was required to do 'to stop [Hill],' including putting his own life at risk." We are not persuaded.

11

Tellingly, Silva relies on the third and fourth *Banks* factors in claiming that the trial court erred in finding he acted with reckless indifference to human life. Yet, the *Banks* factors were developed to analyze whether a defendant is a major participant in the underlying felony. (*Strong, supra*, 13 Cal.5th at p. 706, citing *Banks, supra*, 61 Cal.4th at pp. 807–811.) While the "major participant and reckless indifference elements often ' "significantly overlap" ' " (*Strong, supra*, 13 Cal.5th at p. 706, quoting *Clark, supra*, 61 Cal.4th at p. 615), the *Clark* factors are specifically geared toward the reckless indifference analysis.

Moreover, Silva's concession that he was a major participant in the underlying robbery obviates the need to analyze the *Banks* factors and makes it more likely that he acted with reckless indifference. (*Clark, supra*, 61 Cal.4th at p. 615, citing *Tison v. Arizona* (1987) 481 U.S. 137, 153 [95 L.Ed.2d 127] ["the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life"].) Thus, we consider whether substantial evidence supports the trial court's finding that Silva acted with reckless indifference to human life using the *Clark* factors and address Silva's arguments in the appropriate context.

Under the first *Clark* factor—*knowledge of weapons, including the use and number of weapons*—the trial court found that Silva knew that multiple guns were going to be used, as both he and Hill "actively used their guns to capture and control the victim . . . ." "A defendant's *use* of a firearm, even if the defendant does not kill the victim or the evidence does not establish which armed robber killed the victim, can be significant to the analysis of reckless indifference to human life." (*Clark, supra*, 61 Cal.4th at p. 618.) The mere fact that Silva participated in an armed robbery does not establish reckless indifference to human life. (*Strong, supra*, 13 Cal.5th at p. 706,

12

citing *Banks, supra*, 61 Cal.4th at pp. 807–811.) Here, however, Silva was aware that multiple weapons would be used in the robbery, and he personally used a gun to commit the robbery.

Under the second *Clark* factor—*physical presence at the crime and opportunity to prevent the crime and/or aid victims*—the trial court found Silva was physically present in the company of the shooter, Hill, when she indicated she would not be leaving behind a witness. Silva did nothing to "protest against, physically prevent or in any way dissuade or stop the killing . . . ." "Proximity to the murder and the events leading up to it may be particularly significant where . . . the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' " (*Clark, supra*, 61 Cal.4th at p. 619.)

Here, Silva failed to act as a restraining influence after Hill indicated her intent not to leave a witness. We acknowledge Silva was not present in the home when Hill shot the victim, but he was "physically present during the entire sequence of events culminating in the murder[]." (*Clark, supra*, 61 Cal.4th at p. 619.) He made no effort to provide aid to the victim and explicitly avoided having to go back into the home to check on her status.

Under the third *Clark* factor—*duration of the felony*—the trial court did not make any factual findings. "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence'

13

[citation], possibly culminating in murder." (*Clark, supra*, 61 Cal.4th at p. 620.)

Here, Silva and Hill held the victim at gun point, transported her from her garage to the home, questioned her regarding the location of the barn keys, tied her down to a chair and put a pillowcase over her face, and ransacked the victim's property. Moreover, Silva stated that approximately 20–30 minutes into the robbery a truck pulled into the driveway and stayed for an additional 15–20 minutes before leaving. While the evidence does not show the specific duration of the underlying felony, we can gather that the robbery lasted at least an hour, and Silva also expressed that the robbery had been going on for "too long" before asking Hill if she was ready to leave. Based on this circumstantial evidence, it seems the robbery went on for a prolonged period of time, increasing the opportunity for violence.

Under the fourth *Clark* factor—*knowledge of cohort's likelihood of killing*—the trial court found that Silva knew Hill would use the gun to shoot the victim after they discussed whether they would leave behind a witness. "A defendant's knowledge of factors bearing on a cohort's likelihood of killing are [*sic*] significant to the analysis of reckless indifference to human life. Defendant's knowledge of such factors may be evident before the felony or may occur during the felony." (*Clark, supra*, 61 Cal.4th at p. 621.) Here, Silva had advance notice of the possibility Hill would shoot the victim because she continued to ask whether they were going to leave a witness.

Contrary to Silva's argument, information bearing on Hill's likelihood of killing gained during the felony is also relevant under *Clark*. Thus, even assuming Silva was not aware of Hill's violent nature before the robbery, Silva became aware of the likelihood that Hill would shoot and kill the victim

14

during the robbery because Hill indicated she did not want to leave any witnesses.[5]

Lastly, under the fifth *Clark* factor—*efforts to minimize the risk of violence during the felony*—the trial court found Silva did nothing to "protest against, physically prevent or in any way dissuade or stop the killing" and "essentially endorsed the killing so long as he was not the shooter." "[A] defendant's apparent efforts to minimize the risk of violence can be relevant to the reckless indifference to human life analysis. If the evidence supports an argument that defendant engaged in efforts to minimize the risk of violence in the felony, defendant may raise that argument and the appellate court shall consider it as being part of all the relevant circumstances . . . . But the existence of evidence that defendant made some effort to minimize the risk of violence does not, in itself, necessarily foreclose a finding that defendant acted with reckless indifference to human life . . . ." (*Clark, supra*, 63 Cal.4th at p. 622.)

Here, Silva initially did tell Hill that they did not need to harm the victim and made an effort to minimize the risk of violence. However, Silva's efforts were minimal and ceased upon additional questioning from Hill, and he eventually acquiesced to her statement that she needed to " 'do something' " with the victim. Thus, Silva's efforts to minimize the risk of

---

[5] As part of the trial court's major participant analysis, the court found "specifically that [Silva] must have been aware of Ms. Hill's threatening and violent nature, as the record of conviction demonstrates she consistently portrayed herself in such a way, and frequently made overt statements about committing violent acts. As her partner in crime, and her husband, the court finds [Silva] must have known she was dangerous." As the court indicated, there was additional testimony during the preliminary hearing that shows Hill had violent tendencies and often spoke of killing others to protect herself, prior to the robbery. We find it hard to believe that Silva, despite their short relationship, was oblivious to Hill's violent nature before the robbery.

15

violence do not foreclose a finding of reckless indifference or diminish his culpability.

In this context, Silva's argument that the trial court's finding "placed no limitation on what [Silva] was required to do 'to stop [Hill],' including putting his own life at risk," is disingenuous. As illustrated *ante*, the fifth *Clark* factor asks whether the defendant took steps to minimize the risk of violence. If a defendant takes such steps, he or she may raise that argument to the trial court and the court may consider it as part of its overall analysis. For example, if Silva had taken more meaningful steps to minimize the risk of violence, such as those identified by the court—dissuaded, protested against, or physically prevented and stopped the killing—the court could have considered his culpability diminished. The court did not require, nor does the *Clark* analysis suggest, that there be no limit on what Silva was required to do to minimize the risk of violence. Furthermore, we reject Silva's invitation to incorporate a reasonableness standard into the reckless indifference analysis as unnecessary.

Overall, each of the *Clark* factors supported a finding that Silva acted with reckless indifference to human life. Therefore, we find the trial court appropriately applied the *Clark* factors and its factual findings were supported by substantial evidence.

## DISPOSITION

The order denying Silva's resentencing petition is affirmed.


                                                          Jackson, P. J.

WE CONCUR:

Simons, J.
Chou, J.

A169643/*People v. Victor Pierre Bento Silva*

16